## RHUBERG v. UNITED STATES.*

(Circuit Court of Appeals, Ninth Circuit.   February 24, 1919.)

No. 3196.

1. ARMY AND NAVY ⚙⟜40—ESPIONAGE ACT—PROSECUTION FOR VIOLATION—EVIDENCE.

On trial of a defendant for violation of Espionage Act, § 3 (Comp. St. 1918, § 10212c), by making statements intended and calculated to obstruct the recruiting and enlistment service, evidence of statements made by him before the United States was at war, tending to show his attitude toward Germany and this country, and limited to that purpose, *held* properly admitted.

2. ARMY AND NAVY ⚙⟜40—ESPIONAGE ACT—PROSECUTION FOR VIOLATION—VARIANCE.

An averment in an indictment for violation of Espionage Act, § 3 (Comp. St. 1918, § 10212c), as to obstructing recruiting, etc., that certain statements were made by defendant in the presence of two persons named, is supported by evidence that they were made in the presence of one of them.

3. ARMY AND NAVY ⚙⟜40—ESPIONAGE ACT—VIOLATION—"OBSTRUCT RECRUITING OR ENLISTMENT SERVICE."

A person obstructs the recruiting and enlistment service, within the meaning of Espionage Act, § 3 (Comp. St. 1918, § 10212c), if he interferes with or renders it more difficult, and it is not necessary to establish a violation of the act to prove that he actually prevented enlistments or recruiting.

4. ARMY AND NAVY ⚙⟜40—ESPIONAGE ACT—INDICTMENT FOR VIOLATION.

Indictment under the Espionage Act, § 3 (Comp. St. 1918, § 10212c), for obstructing the enlistment and recruiting service, *held* sufficient.

In Error to the District Court of the United States for the District of Oregon; Charles E. Wolverton, Judge.

Criminal prosecution by the United States against Julius Rhuberg. Judgment of conviction, and defendant brings error. Affirmed.

Ridgway & Johnson and G. G. Schmitt, all of Portland, Or., for plaintiff in error.

Bert E. Haney, U. S. Atty., and Barnett H. Goldstein, Asst. U. S. Atty., both of Portland, Or.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge.   The indictment in this case contained four counts, each charging a violation of the Espionage Act.   Act June 15, 1917, c. 30, 40 Stat. 217–219.   The third count was dismissed before trial.   Upon the trial the jury found the defendant not guilty as to counts 1 and 2 of the indictment, and guilty as to count 4.   The fourth count charges:

"That at and during all the time between the 6th day of April, 1917, and the date of the finding of this indictment, the United States was then and is now at war with the Imperial German government, said state of war having been on said 6th day of April, 1917, duly declared by Congress and duly proclaimed by the President of the United States of America, in the exercise of the authority vested in them as by law provided.

"That Julius Rhuberg, the above-named defendant, on, to wit, between the

1st day of June, 1917, and the 1st day of January, 1918, the exact dates and places being to the grand jury unknown, in the county of Sherman, state and district of Oregon, and within the jurisdiction of this court, then and there being, with the intent then and there on the part of him, the said defendant, to obstruct the recruiting and enlistment service of the United States, to the injury of the service of the United States, did then and there, knowingly, willfully, unlawfully, and feloniously obstruct the said recruiting and enlistment service of the United States, to the injury of the service of the United States, that is to say:

"That Julius Rhuberg, the said defendant at the times and place aforesaid, and to effect the purpose and object as aforesaid, did then and there speak, debate, and agitate to and in the presence of William Mitchell and Luther Davis, and others to the grand jurors unknown, in substance and to the following effect, to wit:

"(1) That the moneyed men had caused the United States to enter the war against Germany.

"(2) That Germany was in the right and the United States was in the wrong, and that he, the said defendant, hoped Germany would win, and that Germany was sure to win.

"(3) That the best thing that they (meaning the said men of registration age and subject to draft) could do when in battle would be to put up their hands and let the Germans take them prisoners.

"(4) That one German could lick ten Americans.

"(5) That the United States was so slow that Germany would have it whipped, before it, the United States, got ready for war.

"(6) That the United States had no business in the war and ought not to have gone in it.

"And further, he, the said defendant, did then and there, in the manner aforesaid, and to effect the object and purpose aforesaid, state, declare, and depose to the persons aforesaid certain filthy statements, declarations, and utterances, the exact words, terms, and language of which are too filthy, vile, and scurrilous to be here set out and made a part of the records of this court, but which in substance were epithets and terms that were contemptuous, defamatory, and insulting to the institutions, laws, and policies of the United States government, and which were then and there intended and calculated to bring discredit upon the military institutions of the United States and to encourage and procure the disobedience to and violation of the existing laws and policies of the United States relating to the prosecution of its war with Germany, all of which statements, declarations, and utterances, as aforesaid, so then and there made by the defendant, as aforesaid, were made with the intent then and there on the part of him, the said defendant, to prevent, hinder, obstruct and delay the recruiting and enlistment service of the United States, to the injury of the United States and to discourage those desirous of enlisting in the military service of the United States and to cause disobedience and violation of the existing laws of the United States relative thereto, and which said statements, declarations, and utterances so made by the defendant as aforesaid, did obstruct the recruiting and enlistment service of the United States to the injury of the service of the United States."

In support of this charge, Luther Davis, one of the persons to whom the defendant is alleged to have made the statements set forth in the indictment, testified upon the trial:

That he "was 22 years of age; * * * had married the 28th of October, 1916, before the draft law went into effect. That he had registered in June, 1917, and had been classified. * * * That he was subject to call, and had the same position as every one else until the last classification. That he had known the defendant about three years. * * * That the discussion he had with defendant after the United States entered the war was at the Mackin place, at the home of the defendant, where the witness had gone with his wife for some vegetables in November, 1917. That they had gone into the front room of the Mackin house, where they saw on the wall the Kaiser's pic-

ture and one German flag. That there was a little boat on the table under the German flag and the Kaiser's picture, which had three American flags on it."

Questioned as to what conversation took place at that time, the witness testified:

That the defendant was telling about fighting in the Franco-Prussian war and what a fine army Germany had; that we had no business in the war, had no call whatever to be in the war; that the moneyed men, and men of the shipping interests, and men around these big steel factories in the East, making munitions, were the men that had brought us into the war. Defendant, speaking of the sale of Liberty Bonds told witness that he would not advise any man that did not have a surplus amount of money to invest in Liberty Bonds, for in a couple of years they would go down—they probably would not be worth 25 per cent. under par; that he would advise witness not to enlist, not to get into the army until after he was drafted; that if a bullet did not kill him, he would die of sickness on account of so many dead people; that defendant knew that witness had registered and was subject to draft; that the effect of these conversations prior to the war upon witness was to cause him to begin to think Germany was in the right, that the United States was not neutral in sending ammunition to the Allies, and that the sinking of the Lusitania was justifiable.

Being asked, "Now, what effect did the conversations of Rhuberg have with you subsequent to our entrance into the war?" the witness answered, "It didn't have much of any; that didn't." Being further questioned, "What was the reason of the change?" the witness answered, "Well, other people talked to me; different people around; I quit visiting Borstels, and other people got talking to me, and I got it out of my head; it put me to thinking." Answering a question of the court, witness testified that defendant appeared to be very much in earnest at the time of his last conversation with him about the war, and appeared to try to impress upon the witness what he said.

The witness, being further examined, was asked on cross-examination:

"Now, these statements that he made to you that you speak of, after we came into the war, they didn't influence you in any way, or deter you from enlistment, did they?"

Witness answered:

"No, sir; they didn't keep me from enlisting, but still it made me feel bad. Q. You hadn't intended or expected to enlist had you? A. No, sir. Q. Nothing he said influenced you in the matter, or changed your intentions in any way as regards going into the service? A. Well, if I hadn't been married, it probably would have. Q. But you were married? A. I was; yes. Q. And had no intention of going until you had to? A. No, sir. Q. The only reason you didn't go was because of your wife and your baby? A. Yes, sir."

[1] In the spring of 1917, and before the United States went into the war, the witness had discussed the war with the defendant, at which time the defendant said:

"That the English got ammunition from America, and Germany couldn't get anything; that we were sending ammunition to kill the Germans with and had no business doing that; that the United States had no business interfering with the Allies, and that we never had been neutral; that Germany was a fine country, far superior to the United States; that you had more freedom, could get anything you wanted there, whisky, or wines, or anything you

wanted; that you couldn't get anything you wanted here any more; that he had been in the German army about three years, and had been in the Franco-Prussian war; that the training of the German army was far superior to the American army; that he was in the German cavalry training and told what a fine horse he had, and what fine training he went through; that defendant told him of Mr. Vol Borstel seeing some American troops in The Dalles, and that they handled a gun like a kid would. He then said that Germany was perfectly right in sinking the Lusitania; that ships carrying contraband of war, with passengers on them who had no more sense than to ride in time of war, ought to be sunk; that if this country got into the war Germans in this country would rebel against this government; that this country was in no shape to fight the German government; that we were so slow that Germany would have the Allies licked before we got ready to fight, and then come to the United States; that Germany was in the right, and she was bound to win; that the German government always took the right side to everything; that they never lost a war, and they never would."

It is contended by the plaintiff in error that the court erred in permitting the witness to testify to the last-mentioned statement made by the defendant prior to the entry of the United States into the war. The court instructed the jury that this evidence had been admitted for a special purpose, and consideration of it would be confined to that purpose only, viz.:

To show so far as it has a tendency in that direction, the bent of mind and attitude of this defendant, whether more favorably disposed towards Germany than to this country, and the effect such attitude, whatever it was, may have had upon his subsequent acts and demeanor, as an aid for determining with what intent he used the language imputed to him by the indictment, if it appears that he uttered the same or some substantial part thereof.

The defendant took the stand in his own behalf and denied in a large measure the utterances imputed to him, and as to others he disclaimed any wrong or disloyal intention. In determining the credibility of his statements, the court instructed the jury to take into consideration the testimony of the government which tended to his inculpation, his former history and deportment, his bent of mind, so far as was disclosed by the testimony, and the defendant's predilection, if any, whether favorable or unfavorable to this government, and what leaning, if any, he had towards Germany as against this government in the present crisis, or whether his present leaning was one of loyalty to this government, and from all this, together with all the other testimony in the case bearing upon the subject of inquiry, ascertain and determine, by a calm, fair, and impartial inquiry and investigation, uninfluenced by any present passion or prejudice, the truth of the charge made against the defendant.

This evidence of statements of the defendant made prior to the entry of the United States into the war, thus restricted and limited by the court was clearly admissible under a well-known rule of evidence upon that subject. Jones on Evidence, par. 142; Jones v. United States, 179 Fed. 584, 103 C. C. A. 142; Williamson v. United States, 207 U. S. 425–451, 28 Sup. Ct. 163, 52 L. Ed. 278.

[2] It is also contended that there should have been a directed verdict in favor of the defendant, because of the alleged variance between the charge contained in the fourth count, "that * * * the defend-

ant did then and there speak, debate, and agitate to and in the presence of William Mitchell and Luther Davis and others," making the statements heretofore mentioned as having been made after the entry of the United States into the war, and the evidence in support of the charge that the statement was made to Davis only. The number of persons to whom the statement was made did not change its character, or the intent and purpose of the defendant. If the statement was an obstruction to the recruiting or enlistment service of the United States, to the injury of the service of the United States, it was as much so when made to one person as when made to more than one. Its criminal character is determined by the intent and purpose of the person making the statement, and not by the number of persons to whom it was made. The failure to prove that Mitchell was present at the time the statement was made to Davis did not prejudice the defendant in any way, and is not a variance under the rule. Bennett v. U. S., 194 Fed. 630–633, 114 C. C. A. 402, affirmed by the Supreme Court in 227 U. S. 333–338, 33 Sup. Ct. 288, 57 L. Ed. 531; Jones v. U. S., 179 Fed. 584–593, 103 C. C. A. 142.

[3] It is further contended that the court should have directed a verdict in favor of the defendant for the reason that there was no proof of the actual obstruction by the defendant of the recruiting or enlistment service of the United States, to the injury of the service or of the United States. The defendant requested the court to instruct the jury that there must have resulted from the statements of the defendant some injury to the recruiting or enlistment service of the United States, and that, as the government had not shown that such statements did in fact result in any injury, either to the recruiting or enlistment service of the United States or to the United States, the verdict should have been directed for the defendant. The question whether the statement of the defendant did result in an obstruction to the recruiting or enlistment service of the United States, to the injury of the service, or to the United States, was clearly a question of fact, to be determined by the jury from all the surrounding circumstances and reasonable inferences to be drawn from established facts under proper instructions from the court. Judge Wolverton instructed the jury upon this feature of the case as follows:

"To obstruct in its broad sense means to hinder, to impede, to embarrass, to retard, and, as used in the indictment, it means active antagonism to the enforcement of the act of Congress; that is, the act providing for the recruiting and enlistment service of the United States. The word does not mean as here used to wholly impede or to block the way. It is sufficient that the act tends to hinder or to make it harder or more difficult for the government to progress with the work of recruiting or enlistment of men into the service. Whatever has this effect works to the injury and damage of the government. The injury follows as the necessary and logical effect and sequence of the act of retarding or making it harder or more difficult for the government to act and carry forward the work of recruiting and enlistment. No other or more specific injury to the United States than this is necessary or required to be shown.

"Having defined these offenses, so denounced by statute, you will appreciate how essential it is for the successful prosecution of the war that none of these evils shall possess the men of the country subject to the selective draft and that no obstruction shall be interposed in any way to impede, re-

tard, hinder, or make it harder or more difficult for the government to recruit and enlist men in the military service; hence there is great and wholesome reason for the statute, and the reason for its rigid enforcement is just as potent and overpowering. Nothing should interfere with the military and naval forces of the United States, nor with the work of recruiting or enlistment of the men that go to make up such forces. Any means employed by which to cause the evils enumerated, or any one of them, is denounced. You will note that the term 'willfully' is employed in the statement of the statute as to what will constitute the offense. This means that the acts complained of must have been done with knowledge on the part of the defendant of what he was doing, and that he, having such knowledge, intentionally did the acts and intended thereby, and had such purpose therein, that the result of doing such acts would be to cause insubordination, disloyalty, or refusal of duty in the military service, or would tend to impede or hinder the recruiting and enlistment of men into the service, to the injury of the United States."

It is contended on behalf of the defendant that the government was required to prove that the defendant's statement accomplished an actual obstruction as distinguished from an attempt to obstruct and proof of injury resulting therefrom to the service or to the United States. In support of this contention, the attention of the court is called to the fact that the act under consideration was amended by the Act of May 16, 1918, c. 75, § 1, 40 Stat. 553, Comp. St. 1918, § 10212c (Public No. 150, 65th Congress), so that the clause of the statute under consideration now reads:

"Whoever * * * shall willfully obstruct or attempt to obstruct the recruiting or enlistment service of the United States."

This amendment was only one of many provisions amending the statute relating to various acts obstructing the government in the prosecution of the war, and was evidently intended to overcome certain technical objections, and enlarge the scope of the statute, so as to include every possible obstruction that might be interposed against the efforts of the government to prosecute a successful war. But it does not follow that the facts in this case did not bring it within the terms of the original statute. We think they did. The loyalty of Davis to the government and his spirit of patriotism was clearly diverted and obstructed by the defendant's statement that "we had no business in the war, no call whatever to be in the war," and his advice to witness "not to enlist, not to get into the army until after he was drafted." All this had its effect upon Davis, and it was not until after he had talked with other people that he came back to his true course.

The decision of Judge Bourquin in U. S. v. Hall (D. C.) 248 Fed. 150–153, upon a similar state of facts, does not convince us to the contrary, and an examination of the various cases where this question has been considered reveals the fact that nearly all the District Judges, where this statute has been under consideration are in accord with Judge Wolverton's instructions to the jury in this case. These cases are reported in Bulletins issued by the Department of Justice, as follows: Bulletin No. 4 (U. S. v. Daniel H. Wallace); Bulletin No. 15 (U. S. v. C. H. Pierce [D. C.] 245 Fed. 878); Bulletin No. 49 (U. S. v. Kate O'Hare); Bulletin No. 53 (U. S. v. Orlando Hitt); Bulletin No. 55 (U. S. v. Perley Doe); Bulletin No. 56 (U. S. v. W. B.

Tanner); Bulletin No. 76 (U. S. v. S. J. Harper); Bulletin No. 78 (U. S. v. Leonard Foster); Bulletin No. 79 (U. S. v. C. H. Waldron); Bulletin No. 81 (U. S. v. J. H. Wolfe); Bulletin No. 82 (U. S. v. Gustave Pundt); Bulletin No. 83 (U. S. v. Harold Mackley); Bulletin No. 85 (U. S. v. Henry Fredricks); Bulletin No. 86 (U. S. v. H. M. Hendrickson); Bulletin No. 89 (U. S. v. Conrad Kornmann); Bulletin No. 90 (U. S. v. Joseph Zittel); Bulletin No. 106 (U. S. v. Rose Pastor Stokes); Bulletin No. 108 (U. S. v. Gustave Taubert); Bulletin No. 109 (U. S. v. Emiel Herman); Bulletin No. 112 (U. S. v. Dick Windmueller); Bulletin No. 120 (U. S. v. J. I. Graham); Bulletin No. 122 (U. S. v. Amos Hitchcock).

In the Second-Circuit, in Masses Pub. Co. v. Patten, 246 Fed. 38, 158 C. C. A. 250, L. R. A. 1918C, 79, in the Third Circuit in United States v. Krafft, 249 Fed. 919, —— C. C. A. ——, in the Fourth Circuit in Kirchner v. United States, Bulletin of Department of Justice No. 174, in the Eighth Circuit in O'Hare v. United States, 253 Fed. 538, —— C. C. A. ——, and in Doe v. United States, 253 Fed. 903 906, —— C. C. A. ——, the Circuit Courts of Appeals in these circuits affirm judgments where the objections were of the same character here presented.

[4] It is contended that the court was in error in overruling defendant's motion in arrest of judgment on the ground that the indictment failed to allege the intended recruiting or enlistment in the military or naval forces of the United States of William Mitchell or Luther Davis, and for the further reason that the indictment failed to charge defendant with knowledge or notice of their intended enlistment or recruiting in such service. That statute does not require such allegations in the indictment or such proof as elements of its violation. The indictment follows the words of the statute with such statement of facts and circumstances as sufficiently identify the acts charged as an offense against the defendant. This is all that is required.

The refusal of the court to grant a new trial is an objection, as has been repeatedly stated, that can only be made in this court as a ground for reversal when there was no evidence to support the verdict. There is no such ground for reversal in this case.

The judgment of the court is affirmed.